IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

M. CALLIE HOFFMAN,                    :
    Plaintiff                           :
                                :
    v.                                  :    Civil No. AMD 00-1446
                                :
LINCOLN LIFE AND ANNUITY             :
DISTRIBUTORS, INC., et al.,          :
    Defendants                          :

...oOo...

MEMORANDUM

The plaintiff, M. Callie Hoffman, is a 62-year-old devout Christian woman. She brought this suit against her former employer, Lincoln Life and Annuity Distributors, Inc., ("Lincoln") and her former supervisors, George L. Buckless, Jr. ("Buckless") and Jeffrey W. Lang, Sr. ("Lang"). Hoffman alleges a host of employment discrimination and retaliation claims against Lincoln: hostile environment discrimination based on gender, religion and age, as well as retaliatory adverse employment actions; and discriminatory and/or retaliatory termination of employment on like bases, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, 42 U.S.C. § 1981a ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621. In addition, she asserts a state-law claim for wrongful discharge. Pending before the court is the defendants' motion for summary judgment. No hearing is necessary. For the reasons stated herein, I shall grant the defendants' motion.

(i)

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings,



depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247 (1986). A fact is material for purposes of summary judgment, if when applied to the

substantive law, it affects the outcome of the litigation. *Id.* at 248. Summary judgment is also

appropriate when a party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof

at trial." *Celotex Corp. v. Catrett*, 477 U.S.  317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the

burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S.

at 248-49. "When a motion for summary judgment is made and supported as provided in

[Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse

party's pleading, but the adverse party's response, by affidavit or as otherwise provided in

[Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.

R. Civ. P. 56(e). *See Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v.

Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as the justifiable

inferences to be drawn therefrom, must be viewed in the light most favorable to the

nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587-88 (1986). The court, however, cannot rely upon unsupported speculation and it has an

affirmative obligation to prevent factually unsupported claims and defenses from proceeding

to trial. *See Felty v. Graves-Humphreys* Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

(ii)

Viewing the facts in the light most favorable to Hoffman, the nonmoving party, the following constitutes a summary of the facts underlying this case. Additional facts are discussed below in the analysis of the legal issues.

In July 1992, Lincoln hired Hoffman to work in the mail room. Soon thereafter, she began to work as secretary to George Buckless. In 1995, upon Buckless's promotion to Regional Chief Executive Officer, Hoffman began working for Jeffrey Lang, the Compliance Officer and Director of the Financial Planning Department. Lincoln terminated Hoffman's employment in June 1999.

Hoffman first alleged that she was the victim of discriminatory treatment shortly after she began working for Lang. Her duties included recording payroll, filing, maintaining Lang's calendar, scheduling appointments, opening his mail and e-mail and handling tasks generated by his mail and e-mail. In the course of her duties, Hoffman checked Lang's e-mail several times a day to screen messages. Lang spent a good part of his day in appointments and he relied on Hoffman to handle as much of his correspondence as she could. Lang received approximately 100 e-mails per week.

A Lincoln employee, Michael Kurland, sent Lang a manila envelope marked "personal and confidential" via inter-office mail. Hoffman opened the envelope and found that it contained pornographic pictures. She brought them to Lang, who then took them to

-3-

Buckless. Buckless held an immediate meeting with Kurland and informed him that he was to cease all such activity. Kurland agreed and apologized to Buckless and he later apologized directly to Hoffman. Hoffman acknowledged that Lincoln dealt with this incident "quickly." Thereafter, Lang directed Hoffman not to open mail addressed to him as "personal and confidential." Hoffman never again saw any pornographic material in Lang's mail.

In the meantime, on or about March 1, 1997, Hoffman completed and signed a Performance Enhancement Plan form, a human resources document, which set forth her assessment of her job performance, areas in which she needed improvement and plans of action to effect those improvements. On the form she stated she needed "to become more proficient in Windows" and "[to] become Internet proficient." She also indicated she would "attend training classes" to become more proficient in Windows. With respect to her customer service responsibilities, Hoffman indicated she would "take Series 7 class," a training activity.

In early July 1998, Mike Feeley, the Vice President of Sales and Marketing, met with the administrative support staff in the Financial Planning Department, including Hoffman, to discuss impending changes in the department. At this meeting, Feeley expressed concerns about the department's "productivity, expenses and workflow." He announced that the administrative staff would be pooled and, specifically, that Hoffman would be assigned to support the work of additional employees, while continuing to work for Lang. It is undisputed that Hoffman failed to perform these additional responsibilities.

-4-

One of the employees Hoffman was assigned to assist was Refik Agri, who was gay and a Muslim. On July 30. 1998, a few weeks after Hoffman was assigned to work with Agri, he complained to management that Hoffman had made a number of comments to him about his religion and his sexual orientation. Among other things, Hoffman told him that his sexual orientation was a "sin" and that it was "his choice, not something he was born with." On one occasion, Hoffman's comments reduced Agri to tears.

Agri also complained that Hoffman refused to send out a mailing as he requested because the members of the professional association to whom it was addressed were homosexual. *See infra* n. 1. The mailing was an announcement about the association's upcoming dinner meeting. It did not mention sex. Hoffman never saw the mailing. Another secretary volunteered to do the mailing. Agri never again asked Hoffman to handle his mail.

On or about August 28, 1998, as a result of Hoffman's conduct toward Agri, Buckless met with Hoffman to advise her that she was not to discuss sexual orientation in the work place. Furthermore, he informed her that she was placed on a disciplinary status of a "Condition of Employment." Buckless told Hoffman that harassment of any kind would not be tolerated and he gave her a copy of Lincoln's handbook and policy on sexual harassment. The "Condition of Employment" stated "[i]f you engage in similar or same behavior in the future you will be terminated." Eventually, Lincoln terminated Hoffman's employment and she timely instituted this action.

(iii)

I first consider Hoffman's claims for hostile environment harassment on the basis of gender and religion. To make out a claim of sex or religious harassment under Title VII a plaintiff must allege and prove that: (1) the harassment was so severe or pervasive as to create a hostile working environment, *Harris v. Forklift Systems, Inc,* 510 U.S. 17, 21 (1993); (2) that the harassment was based on sex or religion, as the case may be; and (3) that there is some basis for imposing liability on the employer. *See Conner v. Schrader-Bridgeport Int'l, Inc.,* 227 F.3d 179, 192 (4th Cir. 2000); *see also Chalmers v. Tulon Company of Richmond,* 101 F.3d 1012, 1017 (4th Cir. 1996), *cert. denied,* 522 U.S. 813 (1997).[1] As the Fourth Circuit has held, "[w]hether harassment is sufficiently severe or

---

[1]Hoffman does not specifically allege a claim for "failure to accommodate" religious discrimination. *See Chalmers v. Tulon Company of Richmond,* 101 F.3d 1012, 1019 (4th Cir. 1996), *cert. denied,* 522 U.S. 813 (1992). In any event, she presents no evidence that she informed her employer that her bona fide religious beliefs conflicted with any employment requirement, *id.,* thus such a claim would also fail as a matter of law. While Hoffman did notify Lang that she found the sexual jokes in his e-mail upsetting, she did not inform him of a religious objection to screening such e-mail. The deposition citations provided by Hoffman's counsel simply do not show what he says they show.

There was one occasion when Hoffman was asked to perform a task and she raised a religious objection. Hoffman's new supervisor, Agri, asked Hoffman to assist with a mailing to members of PLUS, an organization of gay and lesbian professionals, from which he had generated extensive business for Lincoln. The parties dispute whether Agri would send out announcements of the time and place for PLUS meetings in the ordinary course of business. Hoffman objected to working on this mailing, explaining that it was "against her religious beliefs" to send out such a mailing. Another secretary volunteered to help with the mailing, and Agri told Hoffman not to worry, that he did not want her to act contrary to her religious beliefs. Thus, once she informed Agri of her religious objection, Hoffman was relieved of the task. In a letter dated September 9, 1998, Hoffman's counsel informed CEO Buckless that Hoffman "has strongly and deeply rooted religious beliefs." Moreover, he advised that while she would never discriminate against someone based on sexual orientation, "she is not willing to assist in the
(continued...)

pervasive to create an abusive work environment is quintessentially a question of fact."

*Amirmokri v. Baltimore Gas & Electric Co.*, 60 F.3d 1126, 1130-31 (4th Cir. 1995);

*Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).[2]

_____

[1](...continued)

preparation, for any employee, of non-business related material that promotes a lifestyle that is against her religious beliefs." There is no evidence that Hoffman was ever again asked to assist with a mailing to PLUS.

Interestingly, while Hoffman admitted that she never saw what was to be mailed to PLUS, her complaint alleged: "Hoffman was also asked to prepare a sexually explicit pamphlet but she refused." Complaint ¶ 22. A copy of the type of flyer which was to be mailed to PLUS is in the record and it contains no mention of sex. It contains no graphics and it states "Professionals Like Us" will meet for dinner at a certain time and place for a fixed menu at a certain price and that more information can be obtained by calling Agri. It also lists the names and phone numbers of the Co-Chair (with Agri) and the Vice-President of the organization.

An entirely different question, which I do not here reach, would be whether Hoffman has offered sufficient evidence to support her assertion that her bona fide religious beliefs would prohibit her from sending a flyer announcing a dinner meeting at a restaurant for an organization of professionals who are homosexual. While I am aware that some religions consider homosexuality sinful, they usually posit this belief in terms of hating the "sin" and not the "sinner." I am not aware of any religion that would prohibit participation in a mailing to inform a professional group when and where they are meeting, and how much dinner will cost. Hoffman testified on deposition that her religion is the Trinity Assembly of God, but she has not documented that church's tenets on homosexuality. Hoffman herself testified in deposition that while she considers homosexuality to be sinful, she would not discriminate against anyone on the basis of sexual orientation and that she enjoyed a good working relationship with Agri. Hoffman's attorney wrote to CEO Buckless that Hoffman in fact was dedicated to defending homosexuals, including Agri, from mistreatment. Given these professed beliefs, it may be that had she actually looked at what Agri wanted her to mail, and saw that it was not a "sexually explicit pamphlet" as she imagined, she would have had no religious objection. A lack of evidence of a bona fide religious belief might therefore also doom this claim. *See generally Fraze v. Illinois Department of Employment Security,* 489 U.S. 829 (1989)(the issue is simply whether the individual's religious beliefs were sincerely held, and does not necessarily require that an organized religious denomination have a specific tenet supporting the professed belief).

[2]Under the federal statutes prohibiting employment discrimination invoked here, no claim lies against individual supervisors. *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177 (4th Cir. 1998). Accordingly, Hoffman has failed to state a statutory claim against the individual defendants.

To show that harassment was severe or pervasive, a plaintiff must show that she perceived the work environment to be abusive, and that a reasonable person would perceive it to be so as well. *Harris*, 510 U.S. at 22. To determine whether an employer's alleged conduct was sufficiently severe or pervasive to bring it within the proscription of Title VII, a court must examine "'all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'" *Beardsley,* 30 F.3d at 529 (quoting *Harris,* 510 U.S. at 23). Title VII does not prohibit "genuine but innocuous differences" in the ways that persons interact during their employment with each other. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). The prohibition of harassment "requires neither asexuality nor androgyny in the workplace," but it forbids only "behavior so objectively offensive" as to alter the terms or conditions of the plaintiff's employment. *Id.* at 80-81.

Hoffman's harassment claims fail because, even accepting as true Hoffman's account of the events which occurred during her employment at Lincoln, as a matter of law, what she describes as "harassment" was not sufficiently severe or pervasive to violate Title VII. Hoffman's amended complaint describes a combination of circumstances which she alleges made her work environment abusive, but many of these allegations are not even supported by her own deposition testimony, and certainly not by any other evidence. Moreover, even the allegations that are marginally supported by admissible evidence fall far short of the

-8-

mark of what is required to establish the kind of hostile or abusive environment necessary to a cognizable discrimination claim under federal law. In short, viewed objectively, the evidence marshaled by Hoffman utterly fails to support her contention that the events giving rise to her claims were so offensive that they altered the terms or conditions of her employment.[3]

For example, Hoffman's amended complaint alleges that "[w]hen Hoffman worked for Lang, she was forced to open sexually explicit and pornographic mail." Amended

_____

[3]Indeed, on the evidence before me, Hoffman does not fulfill even the subjective element of hostile environment harassment. *See Harris,* 510 U.S. at 22. She testified she was not averse to discussing sexuality in the workplace, whether concerning heterosexuals or homosexuals. Indeed, management formally reprimanded her for discussing homosexuality on the job with a gay employee. She did not find the Clinton/Lewinsky jokes of Hoffman Deposition Exhibits 7 & 8 "offensive" even though she thought they were "pornographic." Moreover, knowing that a co-worker secretary, Debbie Short, was uncomfortable around a male insurance agent who was known to leer at female employees, Hoffman wrote a detailed love letter to Short making it appear that it was from this man. Opening with the salutation, "My Beloved Captivator," the letter attests to his being unable to get her out of his thoughts, to being dominated by her will, falling at her feet desperately pleading for her help, drinking the elixir of her presence, and being unable to continue in this torment. Signed, "Yours forever, Bobby," it closes with a heart pierced by an arrow.

Hoffman admitted writing the letter and putting it on Short's desk. She admitted that Short did not know that Hoffman, and not the co-worker, had written it until Hoffman informed her sometime after Short had read the letter. Hoffman denied that the letter had any sexual connotation whatsoever, Hoffman Dep. at 125, 130, but she admitted it was intended to make Short think this man was "interested in her romantically." Hoffman Dep. at 126. Earlier in her deposition Hoffman testified that while it was not against her religious beliefs to tell jokes, it was against her religious beliefs to tell jokes "that have any sort of sexual connotation." Hoffman Dep. at 42. Nevertheless she thought her letter to Short was appropriate for the workplace because it was just a "joke." Hoffman Dep. at 126-130. Hoffman also testified that she became physically sick upon reading the e-mails she found offensive, though she never left work, confided in her doctor or sought mental health treatment. This kind of selective hypersensitivity, whether couched in an unsubstantiated claim of religious belief or not, is simply not believable, and I do not deem it to constitute evidence that Hoffman has fulfilled the subjective element of the hostile environment harassment test.

Complaint ¶ 20. On deposition, however, Hoffman acknowledged that she only opened one envelope containing pornographic photos during her entire employment. She opened it in the normal course of her duties as the administrative assistant who opened all of Lang's mail. No one compelled her to open it. The envelope arrived in inter-office mail from Kurland addressed to Lang and marked "personal and confidential." When Hoffman saw the photos, she gave them to Lang, who immediately complained to Buckless, Lincoln's CEO. Buckless called in Kurland, reprimanded him, and directed that no such material should ever be sent again in the workplace. Kurland apologized to Hoffman and promised never to repeat such behavior. Hoffman Dep. at 104. Thereafter, Lang told Hoffman not to open any mail labeled "personal and confidential" and she never again saw anything obscene or offensive come through the mail. *Id.* at 105, 108. These facts do not constitute actionable discrimination.

In a similar vein, Hoffman's amended complaint alleged as follows: "Lang also demanded that Hoffman retrieve and open sexually explicit e-mail including sexual jokes and explicit representations of anal sex," referring to Exhibits 1 through 5. Amended Complaint ¶20. Again, however, Hoffman acknowledged on deposition that screening Lang's e-mail was part of her normal duties as his assistant. She would handle as much correspondence as possible herself in order to free up his time. He never required her to open any e-mail he knew or had reason to suspect contained offensive material. Specifically, he never asked her to forward or to send e-mails containing sexual material, and he never

asked her to access the Internet.

Moreover, the exhibits which Hoffman incorporated into her amended complaint (which were actually attached to her original complaint) do not advance her claims. The exhibits included one cartoon picture of two dragons apparently mating. I say "apparently mating" because the cartoon characters' genitals are not visible. The other exhibits were text-only jokes, some of them sexual in nature. There is certainly no evidence of "explicit representations of anal sex" and there is no evidence that Hoffman was "forced" to do anything.

In the course of discovery, Hoffman identified a total of 12 e-mails on which she purports to base her claims, including the five exhibits mentioned above. These e-mails were accumulated over a period of 17 months. Aside from the dragon cartoon, not one of these e-mails contains an image; all the e-mails were  text-only sexual jokes. Hoffman acknowledged that none of the e-mails were addressed to her or targeted her in any fashion. All of them were addressed to Lang and were clearly intended for Lang. Hoffman testified that she complained to Lang that she found the jokes objectionable and that he explained that he had no control over what e-mails others sent to him. Hoffman Dep. at 100. Only one of the 12 e-mails, Hoffman Deposition Exhibit No. 15, was sent by a Lincoln employee; all of the others emanated from people outside of Lincoln. Hoffman asserted that the e-mail sent by the Lincoln employee was offensive, but that it was not obscene or pornographic.

Hoffman Dep. at 175.[4]

It is obvious from the subject line of four of the e-mails that the messages being transmitted were jokes and were not business-related. The same conclusion is obvious as to the remainder of the e-mails upon a mere perusal of the first line or two of the text. Because Hoffman's work responsibilities did not require her to handle jokes and other non-work-related materials, she could easily have elected not to read these e-mails after she had ascertained that they were jokes.

In any event, as a matter of law, in the absence of any contention or evidence that the inappropriate e-mails targeted Hoffman, and because each of the e-mails (though crass and distasteful) is fairly innocuous and could likely have been avoided simply by not reading them, Hoffman's exposure to the e-mails does not constitute severe or pervasive harassment within the contemplation of federal anti-discrimination law. Hoffman admitted that one of these e-mails, Hoffman Deposition Exhibit No. 6, was a news story that was not even offensive to her.[5] Moreover, two of the e-mails from outside parties contained jokes about

_____

[4]This exhibit contained the identical story/joke as Hoffman Deposition Exhibit No. 14. In other words, two different people, acting independently, sent this story to Lang. The story concerned a man making a speech at his wedding reception thanking everyone for coming and then instructing the 300 assembled guests to reach under their chairs where he had placed a gift for each one. Under each chair was an envelope containing a photograph of the bride having sex with the best man. While everyone viewed the photo, the man making the speech uttered an angry expletive to his new wife and one to his best man, and then he left the reception. The senders of these e-mails indicated in the subject line that the enclosed was "particularly funny."

[5]Hoffman Deposition Exhibit No.6 is a parody of a press release in which the letter "D" announces that it is withdrawing its sponsorship of Sesame Street to protest the introduction of a
(continued...)

former President Clinton and the investigation surrounding his activities with Monica Lewinsky. One contained four jokes, each of which implied a sexual theme, and was sent on February 6, 1998; the other, sent on October 16, 1998, was a list of "Ben & Jerry's New Presidential Ice Creams" containing word-plays on names of ice cream flavors, implying either sex or impeachment. Hoffman described these e-mails as "not offensive" or "obscene," but "pornographic." Hoffman Dep. at 155-57, 160.[6] It is implausible, in the context of the contemporaneous presidential impeachment proceedings and accompanying national media fury, to assert that exposure to jokes about former President Clinton with implied sexual themes, on their own, could constitute workplace "harassment" rising to the level of a change in the terms and conditions of employment. I will not delineate the remaining e-mails; it suffices to observe that some of them are, in my opinion, less objectively offensive than the ones described herein, and some are somewhat more offensive. In any event, exposure to them does not create an abusive environment.

Furthermore, the evidence as to harassment based on religion is nonexistent. One e-

_____

[5](...continued)
homosexual muppet character.  There is no mention of sexual conduct.  The mock press release refers to "religious conservatives," "right-wing groups like Christian Coalition" and the "extremely vocal minority" who oppose the new muppet character. "D" was withdrawing its sponsorship because these groups are some of its biggest clients frequently using words like "demagoguery, dogma and doctrine." On deposition, Hoffman explained repeatedly that she did not find this e-mail to be offensive in any way. Hoffman Dep. at 145-53.

[6]Without referring to any religious tenet, Hoffman explained that while not all sex was obscene, obscenity can relate to sexuality. However, profanity is obscene in her definition. Hoffman Dep. at 153.

mail in the record mentions the "Christian Coalition" and "religious conservatives;" however, Hoffman concedes that this e-mail was not offensive. *See supra* note 5. Moreover, when Hoffman objected on religious grounds to preparing a mailing for a group whose membership was homosexual, her employer honored her objection. Thus, she has not projected evidence sufficient to generate a genuine dispute of material fact as to her gender or religious harassment claims. Accordingly, those claims fail as a matter of law.

(iv)

Hoffman alleges that after she complained about being offended by the e-mails with sexual content, Lincoln unlawfully retaliated against her by *increasing* the harassment to which she was subjected and ultimately by terminating her employment. Title VII makes it an "unlawful employment practice for an employer to discriminate against any . . . employee[] . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Of course, an employee is protected from retaliation even if she is not the victim of discrimination in fact; that is, it is not necessary that she oppose behavior that *actually* constitutes a Title VII violation, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n.1 (4th Cir. 1985); rather, the test is whether she reasonably believed the behavior she opposes is sufficiently offensive and severe or pervasive to constitute harassment. *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 415 (4th Cir. 1999), *cert. dismissed*, 528 U.S. 1146 (2000); *see Clark County School Dist. v. Breeden*, __U.S.__, No. 00-866, 2001 WL 402573 (April 23,

2001)(per curiam). Thus, even though (as discussed above) Hoffman's harassment claims fail as a matter of law, she may nevertheless maintain a retaliation claim.

The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000)(*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). First, the plaintiff must establish a prima facie case of retaliation. *Id*. (*citing Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). The burden then shifts to the employer to produce a legitimate nondiscriminatory reason for the adverse action. *Id.* The plaintiff must then demonstrate the existence of a jury question by projecting evidence tending to show that the employer's stated reason was a pretext for retaliation, i.e., by showing that the ostensible reason was likely false and that, based on the cumulative evidence, retaliation was the likely motivation. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-47 (2000).

Assuming that Hoffman's complaints about exposure to sexual e-mails constituted protected activity under Title VII, Lincoln is nevertheless entitled to summary judgment on the retaliation claim. First, Hoffman has failed to offer evidence that Lincoln's response to her complaints was to subject her to a hostile environment, i.e., as a matter of law, Hoffman was not subjected to "retaliatory harassment." *See Von Gunten v. Maryland*, 243 F.3d 858 (4th Cir. 2001). Second, to the extent Hoffman asserts that her termination was an act of retaliation. she has failed to generate evidence tending to prove that the stated reasons for her termination were a pretext for unlawful retaliation.

Hoffman argues that, in retaliation for her protected activity, Lincoln "changed the job requirements of her position [by requiring her to take the Series 11 exam] in order to get her out of the company." She cites no evidence in the record to support this argument, however. In any event, there exists no evidence that Lincoln's requirement that Hoffman study for and take the Series 11 exam constituted abusive treatment rising to the level of a hostile environment growing out of a retaliatory motive.

On deposition, Hoffman asserted that she believed that success on the Series 11 administrative assistant exam was not a job requirement of her administrative assistant position. She asserts that she signed a Lincoln form when she began working at Lincoln that defined her job duties, but she did not supply this form to the court. Furthermore, she claims that she was a "nonexempt employee" who therefore did not need to be licensed in any way, but no evidence is provided to support this assertion. CEO Buckless testified on deposition that whether an administrative assistant needed to take the Series 11 exam was a decision within the discretion of the supervisor, in Hoffman's case, Lang. Buckless and Lang both testified on deposition that Lang had decided that Hoffman should take the exam. Hoffman testified that other administrative assistants were also required to take the exam, though she claims they were not asked to do so until sometime after she had been asked to do so.

Hoffman testified that when Lang told her she should take the Series 11 exam, she told him she would not do it. She explained that she would not have considered the exam a valid job requirement unless she had received something in writing from Lincoln's

headquarters to that effect. She also asserted that she did not want to take the exam because she had heard from another secretary that it was difficult. Lang also testified that Hoffman was free to schedule for herself whatever time she needed to study for the exam during normal working hours. Hoffman does not dispute this contention. An employee is not entitled to a job that does not change. *McGhee v. Danzig*, No. 99-3362 *n.14, 2001 WL 410052 (D. Md. April 19, 2001). In the context of a department which was receiving low audit scores and that was being required to reorganize in order to improve efficiency and profitability, Hoffman's expectation that her job duties would not change was particularly unreasonable. As a matter of law, therefore, it is clear that Lang's insistence that Hoffman take the Series 11 exam was not abusive and did not constitute retaliatory harassment.

Hoffman refers in a general way to the fact that Lang wrote unjustified negative evaluations of her work performance, and she implies that these negative evaluations were in retaliation for her complaints about the e-mails. However, none of Hoffman's evaluations, positive or negative, are in evidence. Thus, this contention is rejected as unsupported by evidence.

It is also undisputed in the record that Lincoln had legitimate nondiscriminatory reasons to terminate Hoffman's employment, both because her computer skills were deficient and because she refused to take the Series 11 exam. A letter Hoffman wrote to Lang dated December 14, 1998, states, "I accept responsibility for all the legitimate complaints that you and others have about my performance at Lincoln and invite suggestions

-17-

on how we can resolve whatever is standing in the way of getting the job done." Lincoln
Summ. J. Mot. Ex 7. Hoffman does not dispute that her failure to improve her computer
skills was a long-standing problem.

Hoffman set a goal for herself in March 1997 and December 1998: she would become
proficient with various computer programs. Gieseman Declaration, Exs. 2 & 6 (Performance
Enhancement Plans). This was for good reason. It is undisputed that for two years prior to
her termination, Lang repeatedly counseled Hoffman that she must become more proficient
in the CIM program. on which he relied heavily. Lang wrote a memo to Office Manager
Debbie Gieseman on May 4, 1999, explaining that he had given Hoffman a verbal warning
that she must improve her CIM proficiency to "intermediate skills" (by June 15, 1999) and
that she must take the Series 11 exam (by August 1, 1999). On June 23, 1999, Lang wrote
again to Gieseman advising that Hoffman's CIM competence had not improved and that two
years of counseling her and providing her opportunities to improve had produced no
improvement. On June 28, 1999, Lang, Gieseman and Hoffman met and Lang terminated
her employment, explaining that Hoffman had failed to meet minimum CIM standards, and
that her unwillingness to take the Series 11 exam was unacceptable. That these were the
genuine reasons for Hoffman's dismissal is not put seriously in dispute by admissible
evidence, and as a matter of law, they constitute unimpeached and legitimate
nondiscriminatory reasons for Hoffman's termination.

(v)

Hoffman's claim that she was "subjected to discriminatory age-related comments and was discharged due to her age" is likewise unavailing. *See Burns v. AAF-McQuay*, 166 F.3d 292 (4th Cir. 1999). First, she has not rebutted Lincoln's evidence that she was terminated for legitimate nondiscriminatory reasons. *Moore v. Bd. of Educ. of Talbot County*, 63 F.Supp.2d 667, 671 (D. Md.), *aff'd*, 188 F.3d 502 (4th Cir. 1999). In any event, she alleges that she was subjected to only one age-derogatory comment, and a fairly mild one at that.[7] This lone statement, expressed as the opinion of someone other than the decision maker, is insufficient as a matter of law to generate a genuine dispute of material fact as to whether age was a factor in Hoffman's termination. *Burns,* 168 F.3d at 294-95; *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 549 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996). Accordingly, I shall grant summary judgment in favor of Lincoln as to the age discrimination claims.

(vi)

Finally, Hoffman alleges that she was wrongfully discharged in violation of state law for complaining about sexual harassment and for refusing to distribute obscene material. Ordinarily, upon the grant of summary judgment as to the federal claims, I would not consider this state-law claim. *See* 28 U.S.C. § 1367(c). As a matter of law, however,

---

[7]She alleges that Lang told her that his partner had said that Hoffman was "an old lady standing in the way of the company getting ahead."Amended Complaint ¶ 31; Hoffman Dep. at 205.

Hoffman has not created a genuine issue of material fact as to whether she was discharged for complaining about unlawful sexual harassment or that she was ever asked to distribute obscene material. Accordingly, in the interest of judicial economy, I shall exercise supplemental jurisdiction and grant the motion for summary judgment as to this claim, as well.

(vii)

For the reasons explained above, I shall grant the motion for summary judgment as to all claims. An order follows.

Filed: April 30, 2001

ANDRE M. DAVIS
UNITED STATES DISTRICT JUDGE